# In the United States District Court
# for the
# Western District of Texas

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | SA-09-CR-903 |
| | § | |
| RICHARD M. BENAVIDES | § | |

## ORDER

On this day came on to be considered Defendant's motion to suppress.

### Background

Defendant is charged in a one-count indictment with possession with intent to distribute a controlled substance (cocaine) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii).

Sometime in August 2009, San Antonio Police Detective Bryan White was told by a confidential source (CS) that someone by the name of Richard was trafficking in cocaine in one of several vehicles. The CS had previously provided Det. White with true and reliable information. Subsequently, Det. White received information from a second confidential source (CS2) that a "Richard" was trafficking in narcotics. CS2 also provided Det. White with the license plate of one of "Richard's" vehicles. Det. White "ran" the plates and determined that the registered owner of the vehicle was the Defendant, Richard Benavides. Det. White also determined the Defendant's address, driver's license information and photograph. Det. White showed the photo to the two confidential sources and they confirmed that was the "Richard" who they knew to be selling narcotics.

1

On differing dates, Det. White conducted surveillance of the Defendant's home and followed him as he traveled to various locations. Det. White saw that as the Defendant traveled to various locations such as a Wendy's or Walgreens, he would remain in his vehicle, another person would come and enter his vehicle, stay for a short period of time, leave the Defendant's vehicle and Defendant would leave the premises. Det. White testified at the suppression hearing that based upon his experience and training, this behavior was consistent with narcotics trafficking. Det. White also testified that the behavior he witnessed also corroborated the information that was provided to him by the two confidential sources.

On November 12, 2009, Det. White again set up surveillance at the Defendant's home. Defendant left his home and went to two car lots. Det. White followed the Defendant and witnessed him enter the car lots, meet with a few people for a brief period, and leave the car lots. The Defendant then returned to his home and again left his home driving a red/maroon Corvette. The Defendant traveled to a Wendy's restaurant (the same restaurant Det. White previously saw the Defendant meet individuals in the parking lot).

Det. White observed that the Defendant was parked in the back parking lot of the Wendy's for 5 to 7 minutes and remained in his vehicle. Det. White did not observe anyone meeting the Defendant. At that point, Det. White requested that a marked SAPD patrol unit make contact with the Defendant.

At about 7:00 p.m., SAPD Officers Ray Garcia and David Larios responded to the call. Officer Larios asked him what "his business was in the parking lot" and after the Defendant appeared nervous and "fumbling" his answer, the Defendant was asked to step outside his vehicle. Officer Larios read the Defendant his *Miranda* warnings and then asked the Defendant if his car

2

could be searched. The Defendant consented to the car search.[1] After nothing illegal was found, the officers called for a canine unit to respond to the scene.[2] The Defendant was detained, but not placed under arrest.

The canine handler, SAPD Officer David Moravits, responded to the scene with his dog.[3] The dog searched the vehicle and alerted to a pouch on the driver's door. A ball of tin foil containing cocaine was found. At that point the Defendant was arrested and placed in handcuffs.

The Defendant was then placed in a patrol car and was again read his *Miranda* rights by Det. White. Det. White informed the Defendant that he had been under surveillance for a period of time and extended to the Defendant an opportunity to cooperate. Det. White informed the Defendant he could consent to a search of his residence, but if he did not consent that a search warrant for his home would be obtained. After initially refraining from giving consent to search his residence, the Defendant subsequently signed a written consent.[4]

---

[1] The Defendant testified at the suppression hearing. He agreed that he gave verbal consent to this search of his car.

[2] After the search initially revealed nothing illegal, the Defendant testified that he asked one of the officers if he could leave now and that the officer responded "You can't leave now, you have been a nice guy ..., don't make me put the handcuffs on you." The Court is not persuaded by this testimony. By all accounts all police officers and the Defendant were respectful and cooperative throughout the investigatory stop.

[3] The Defendant testified that upon seeing the dog arrive he said "what is this?" He also complained that the dog "is going to scratch my vehicle. He is going to mess up my vehicle." The Defendant's counsel asked the Defendant: "Was it in your mind your goal to stop them from putting that dog in your car or were you just worried about a scratch?" The Defendant testified he was "worried about the scratch."

[4] The Defendant testified that he initially refused to sign the consent form. Gov't Ex. A. The Defendant further testified that Det. White told him that if he procured a search warrant, he was "going to get the SWAT team in there and we are going to go in there with guns up we are going to break your house down and just go in there." He further testified that he reconsidered
3

The Defendant provided police officers with the key to his residence and entry was made. The Defendant advised Det. White that he had a small amount of cocaine in the front room of his residence. A bag containing several other small baggies of cocaine (total 14 grams) was found in that location. The police canine did a search of the residence. In addition to the cocaine identified by the Defendant, the police seized 1,600 grams of cocaine stored away in various locations. In addition, the police seized $42,918 in cash, two scales, and various firearms. Small amounts of cocaine were also recovered from the five other vehicles at the residence.

## Analysis

Defendant argues that the police officers had no reasonable suspicion to stop his vehicle. Alternatively, he argues that he consented only to the initial search of his car and when the initial search was completed he withdrew his consent to any further search and asked to leave the premises. Finally, he argues that he was coerced into signing the consent to search of his residence.

### A.  Reasonable suspicion existed to stop the vehicle

The Fifth Circuit addressed a case similar to the facts of this case in *U.S. v. Jackson*, 328 Fed. Appx. 933 (5th Cir. 2009). The Court stated:

> An investigative vehicle stop is permissible under *Terry* only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. Although 'reasonable suspicion' need not rise to the level of probable cause, a 'mere hunch' is insufficient. The stop 'must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal

---

his decision to sign the consent form because he has a brother who sometimes stays in his house and he uses a cordless phone and he was concerned that if the police made a forced entry into his home they might mistake the cordless phone for a gun and accidently kill his brother. He testified that no one was "bothering" him or "in his face" as he reconsidered his decision to sign the consent form.

activity.' The circumstances, however, 'need not rule out the possibility of innocent conduct.' An officer's reasonable suspicion must be based on the 'totality of circumstances confronting her, including all information available at the time she decided to stop [the defendant].' As a corollary ... of the rule that the police may rely on the totality of facts available to them ..., they also may not disregard facts tending to dissipate reasonable suspicion.

Reasonable suspicion, however, does not have to be based on a personal observation. It can be based on information provided by a confidential informant, if the information possesses an 'indicia of reliability.' In turn, whether information has indicia of reliability depends on, inter alia, '[1] the credibility and reliability of the informant, [2] the specificity of the information contained in the tip or report, [3] the extent to which the information in the tip or report can be verified by officers in the field, and [4] whether the tip or report concerns active or recent activity, or has instead gone stale.' No single factor is dispositive and '[a] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'

*Id.* at 935-36 (citations omitted).

After evaluating the above law, the Court concluded that the police officers lacked reasonable suspicion to initiate their investigatory detention because their surveillance failed to "support a suspicion of criminal activity." *Id.* at 937.

The facts of this case, however, are distinguishable from *Jackson*. Here the confidential sources confirmed the photograph of Defendant as the man they knew as Richard selling drugs. Det. White observed the Defendant travel to various locations such as a Wendy's or Walgreens, and observed that the Defendant would remain in his vehicle, another person would come and enter his vehicle, stay for a short period of time, leave the Defendant's vehicle and Defendant would leave the premises. This surveillance supports a suspicion of criminal activity consistent with narcotics trafficking and that observation corroborated the information provided to Det. White by the two confidential sources.

**B.     Defendant did not revoke consent to search of the car**

The Defendant concedes that he voluntarily gave consent to the initial search of the car. The issue is whether he effectively revoked consent to search by the canine. The Court finds that he did not. He expressed concerns about his car being scratched by the canine, but did not tell officers that he was revoking his earlier consent. *U.S. v. Facen*, 135 Fed. Appx. 734, 736 (5th Cir. 2005) ("Facen consented to the officer's search of his backpack for illegal drugs. Facen, knowing the contents of his backpack had the responsibility to limit the scope of his consent if he deemed it necessary to do so. *See United States v. Rich*, 992 F.2d 502, 507 (5th Cir.1993). Facen stood silent when the officer began opening the packages. Facen's failure to object to the continuation of the search once consent was given was properly considered as an indication that the search of the wrapped packages was within the scope of the initial consent to search the backpack.").

**C.     Consent to search residence**

The consent exception to the warrant requirement requires the government to show, under a totality of circumstances, that the defendant's consent to search was voluntarily given. *United States v. Freeman*, 482 F.3d 829, 831-32 (5th Cir. 2007). In evaluating voluntariness, the Court considers six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *United States v. Gomez-Moreno*, 479 F.3d 350, 357 n.5 (5th Cir. 2007). "No single factor is dispositive." *Id.*

The Defendant had been placed under arrest, but no coercive police procedures were used. The Defendant was given an opportunity to cooperate and he considered his options. He was read his *Miranda* rights and was aware he could refuse consent. He signed a consent form that again advised him of his rights. The Defendant has a high school diploma. The Defendant informed another police officer to summon Det. White after he left the area, and the Defendant reconsidered his position. The Court gives little weight to the explanation offered by the Defendant at the suppression hearing. The statement was rambling and confusing. The statement is also in stark contrast to the smiling, laughing photograph taken of the Defendant the day of the search. The Court finds that the consent to the search was done voluntarily.

## Conclusion

Defendant's motion to suppress is denied.

It is so ORDERED.

SIGNED this 21st day of December, 2010.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE